# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CASSANDRA BALLARD-CARTER,

*Plaintiff,*

v.

VANGUARD GROUP, INC.

*Defendant.*

CIVIL ACTION
NO. 15-05370

**PAPPERT, J.**                                    **JULY 26, 2016**

## MEMORANDUM

Cassandra Ballard-Carter ("Ballard-Carter") sued her former employer, Vanguard Group, Inc. ("Vanguard") for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* (2001) ("PHRA").  She claimed initially that she suffers from hearing impairment and dyslexia and that Vanguard discriminated against her, retaliated against her, subjected her to a hostile work environment and failed to accommodate her disabilities.

Vanguard filed a motion for summary judgment on each of Ballard-Carter's claims.  At oral argument on the motion, counsel for Ballard-Carter withdrew her discrimination and retaliation claims, leaving only the claims for a hostile work environment and failure to accommodate.  Counsel also withdrew Ballard-Carter's contention that her alleged dyslexia rendered her disabled under the ADA and PHRA.

After thoroughly reviewing the record, on July 15, 2016 the Court granted Vanguard's motion.  (ECF No. 22.)  This Memorandum explains the Court's decision.

1

**I.**

On April 15, 2013 Ballard-Carter went to the Norriton Hearing Center for an audiological evaluation.  (Def.'s Mot. for Summ. J. ("Def.'s Mot."), Ex C, ECF No. 14.)  On her "audiological history" form, Ballard-Carter wrote that she has experienced "difficulty hearing" for "10+ years but [her hearing is] getting worse."  (*Id.*)  She stated on the form that she has "intermittent" ringing in her right ear and that she occasionally experiences dizziness and nausea.  (*Id.*)  Dr. Karen Jacobs Cooper performed an audiogram which revealed "moderate left hearing loss" and "severe right hearing loss."  (*Id.*)  Dr. Cooper referred Ballard-Carter to Dr. David Phillips for "a definitive diagnosis."  (*Id.*)  In her letter to Dr. Phillips, Dr. Cooper wrote that the "[a]udiological test results indicate a bilaterally asymmetrical sensorineural hearing loss, moderate for the right ear and mild for the left ear."  (*Id.*)

No doctor has ever diagnosed Ballard-Carter as "deaf," "partially deaf," "deaf in one ear" or dyslexic.  (Def.'s Stmt. of Facts ("Def.'s SMF") ¶¶ 10–12, Pl.'s Resp. to Def.'s SMF ("Pl.'s SMF") ¶¶ 10–12; Def.'s Mot., Ex. T ("Ballard-Carter Dep.") 195:22–196:3.)  She testified that a doctor told her in 2013 or 2014 that she should continue to get her hearing checked because hearing loss "will affect your ability to communicate."  (Ballard-Carter Dep. 190:21–191:14.)  Although she has never been diagnosed with dyslexia, Ballard-Carter believes that she is dyslexic due to her trouble learning and the difficulty she experiences with her "ability to think."  (*Id.* 199:13–18.)

**A.**

Ballard-Carter graduated high school in 1989, receiving "mostly As and Bs," and did not enroll in any special education courses or have any particular difficulty with her schoolwork due to hearing loss or dyslexia.  (*Id.* 87:13–88:9.)  She graduated from Strayer University *cum laude*

with a degree in business administration with a concentration in public administration.  (*Id.*
93:15–21.)  Ballard-Carter subsequently received a master's degree in business administration.
(*Id.* 99:1–102:10.)  At no point during college or her graduate program did she request an
accommodation for hearing loss or dyslexia.  (*Id.* 100:24–102:10.)

Prior to joining Vanguard, Ballard-Carter worked as a bank teller.  (*Id.* 106:7–107:13.)
That job required her to review deposit slips and checks, process the customer's requests and
accurately input the transaction information into the bank's computer system.  (*Id.* 109:3–111:4.)
Ballard-Carter testified that she performed this job well and with "98.99 percent" accuracy.  (*Id.*
111:6–13.)

Vanguard hired Ballard-Carter as a processing associate in 1996.  (Pl.'s Compl. ¶ 22, ECF
No. 1.)  She performed well in that capacity and similar roles, which all required "fast and
accurate reading of words and numbers . . . and the inputting of such information into the
computer system."  (Def.'s SMF ¶ 20; Pl.'s SMF ¶ 20.)  In 2007, Ballard-Carter became a
"Client Relationship Administrator" ("CRA").  (Def.'s SMF ¶ 2; Pl.'s SMF ¶ 2.)

As a CRA, Ballard-Carter was responsible for "running [a client's] retirement plan on a
day-to-day basis."  (Def.'s Mot., Ex. S ("Bakey Dep.") 11:4–5.)  In that role, Ballard-Carter
"[p]artner[ed] with Relationship Managers in the execution of client services needs," and
"[w]ork[ed] directly with clients on operational issues, service adoptions and plan
enhancements."  (Def.'s Mot., Ex. A.)  The qualifications that Vanguard required for CRAs
include "Client Relationship Management skills," "[e]xcellent verbal and written communication
skills" and "[a]bility to exercise good judgment in decision making."  (*Id.*)

Beginning in the Fall of 2011, Ballard-Carter began reporting to Steve Bakey, a Client
Administration Manager ("CAM").  (Def.'s SMF ¶ 4; Bakey Dep. 9:7–9.)  CAMs closely

supervise the CRAs and report to Client Relationship Managers ("CRMs"), who are "responsible for the overall client relationship." (Def.'s SMF ¶ 4; Bakey Dep. 10:16–11:17.) In order to evaluate a CRA's performance, Bakey "gather[ed] feedback from people that they work[ed] with, whether it be a client or other internal Vanguard partners, as well as anything [he] observe[d] as a manager." (Bakey Dep. 11:21–12:4.)

Bakey testified that as of 2012, developing "communication [skills] was a piece of what [Ballard-Carter] was working on." (*Id.* 18:17–19.) He stated that there were "issues" with her spelling and grammar, (*Id.* 21:5–11), and that she would become defensive when he attempted to talk with her about it: "I tried to deliver [feedback regarding her communication skills] in one of those one-on-one sessions, and Cassie [Ballard-Carter] essentially said to me she didn't want to talk about it . . . . she would at times leave the room or at other times she would just refuse to meet with me."[1] (*Id.* 28:10–21.) He testified that she refused to meet with him or left the room during a private discussion "several times." (*Id.* 29:2–14.)

**B.**

In February 2013, Ballard-Carter was assigned to work on Vanguard's AgFa Corporation ("AgFa") account under CRM Kathy Broadhag. (Def.'s Mot., Ex. D; Def.'s SMF ¶ 21; Pl.'s SMF ¶ 21.) To learn more about Ballard-Carter's previous work performance, Broadhag spoke with Laura Dolan, another CRM who had previously worked with Ballard-Carter. (Def.'s Mot., Ex. D; Def.'s SMF ¶ 23; Pl.'s SMF ¶ 23.) During that conversation, Dolan told Broadhag to "be on the lookout for written communication issues," such as grammar mistakes. (Def.'s Mot., Ex. D.) Broadhag then asked Bakey about Ballard-Carter's performance. (*See id.*) Bakey told her that he had "been working on her written presentation skills" and that there was room for

---

[1]      Vanguard uses the term "one-on-one" to refer to meetings where a supervisor meets individually with an employee to provide feedback or a performance review. (Bakey Dep. 20:17–23.)

improvement in that area.  (*Id.*)  Bakey also told Broadhag about Ballard-Carter's strengths, including her "quick follow through and drive to learn new things" and that he "would be there to help her" in her continued development.  (*Id.*)

On February 15, 2013 Bakey met with Ballard-Carter to tell her about his discussion with Broadhag and specifically how she might improve her communication skills.  (*Id.*)  Ballard-Carter "realized immediately that the feedback had to have come from [Dolan]" and that she felt she was working in a "hostile work environment because people were talking about her behind her back."  (Def.'s Mot., Exs. D, F.)  Bakey told her that "together we can work to impress [Broadhag]" and that "she needed to look past the person and determine if there is something real in the feedback about her written communication skills."  (Def.'s Mot., Ex. D.)  He told Ballard-Carter that he "[saw] an opportunity [for improvement] and that is why we started working together on her presentation of material to clients."  (*Id.*)  The two discussed ways that they could work together to improve Ballard-Carter's communication skills.  Bakey "told her that as long as she agreed that written communication is something she needs to work on, [he would] help her as best [he could]."  (*Id.*)  Bakey emailed Ballard-Carter later that day thanking her for talking with him.  She responded: "Thanks to you as well – Although I was a little upset, (not at you) – ***You turned it around***."  (Def.'s Mot., Ex. E (emphasis in original).)

Following that meeting, Ballard-Carter contacted Bakey's supervisor, Vince Garzarella, and human resources employee Dena Bailly.  (Def.'s Mot., Ex. F.)  She told Garzarella that "she couldn't work here anymore because of the hostile work environment."  (*Id.*)  She detailed her February 15 discussion with Bakey where she stated that he told her that she is "the only one on the team that he has issues with in terms of communication."  (*Id.*)  She stated that Bakey "get[s] defensive very quickly if you mention something to him . . . that he does not like."  (*Id.*)  For

example, she wrote that on one occasion Bakey approached her at her desk and asked to speak with her privately.  She responded by asking what he wanted to discuss.  (*Id.*)  As the two were walking towards a private room, he "pointed his finger at [her] and said 'you just pissed me off, why would you ask me what is being stated in your one on one.'"  (*Id.*)  Ballard-Carter wrote that Bakey "would always bring up the pass [sic] . . . personal items, curse or even discuss others in a negative way within one on ones."  (*Id.*)

Bailly spoke with Ballard-Carter about her complaint.  (Def.'s Mot., Ex. G.)  Ballard-Carter told her that she feels like she is working in "a hostile work environment because people have a negative perception of [her]."  (*Id.*)  Ballard-Carter stated during that meeting that she and Bakey had put "a plan in place for her to lea[r]n the things she doesn't know."  (*Id.*)  Bailly and Ballard-Carter also spoke about Ballard-Carter's specific concerns with Bakey.  Bailly agreed that she would speak with Bakey and Garzarella about: (1) the way Bakey communicates with Ballard-Carter, including his use of profanity; (2) Bakey's specific comments to Ballard-Carter that "you're the only one I go through this with" and "you pissed me off;" and (3) Ballard-Carter's fear that Bakey talks about her to others.  (*Id.*)

Bailly emailed Ballard-Carter on February 26, 2013 after their meeting thanking her for meeting and "bringing your concerns to my attention."  (*Id.*)  Bailly wrote that "I want to ensure you feel heard and that your concerns are being addressed.  You said you feel [Bakey] creates a hostile environment and we take these allegations seriously."  (*Id.*)  She continued: "While I cannot conclude that [Bakey] created a hostile environment, I have addressed your concerns

regarding his management style with both [Garzarella] and [Bakey].  [Bakey] is committed to altering his style to meet your needs and helping you develop professionally."[2]  (*Id.*)

Ballard-Carter responded to Bailly's email the following day, stating that she believed Bailly was "overly focused on [ ] Bakey" and that she also had concerns about how others perceived her at work.  (Def.'s SMF ¶ 38; Pl.'s SMF ¶ 38.)  "To be perceived negatively is a concern for everyone not just me [sic.  In my eyes it seem that the past is never going to go away while me being in this environment [sic]."  (*Id.*)  Bailly responded by reiterating that "what [Ballard-Carter] described to [her] is not unlawful and does not constitute a hostile work environment" and that Bailly has already spoken with her management team regarding her concerns.  (*Id.*)

## C.

On April 2, 2013 Ballard-Carter submitted an anonymous complaint through Vanguard's "Open Channel" forum.[3]  (Def.'s Mot., Ex. N.)  In that complaint, Ballard-Carter stated that it was unfair to be told that she was not subject to "a hostile work environment, [even though] the manager in question curses and also is very defensive."  (*Id.*)  She wrote that the manager "would over and over again point out every single error that I have made or make and send it to me [sic]."  She also stated that the unnamed manager would "roll up a chair next to me and speak LOUDLY of what I'm doing in front of my peers."  (*Id.*)

A Vanguard representative responded to the submission, stating that "[a]s the Open Channel is anonymous, it is difficult to respond in a meaningful way to truly address the issues

---

[2]      Ballard-Carter also stated during her meeting with Bailly that she felt she did not have adequate training on some of the tasks she was being asked to perform.  (Def.'s Mot., Ex. G.)  Bailly told Ballard-Carter in an email that Bakey is aware of the issue and "is fully committed to getting you up to speed on any remaining functions you may need additional training on."  (*Id.*)  Bailly also noted in an internal memorandum that Bakey had already met with Ballard-Carter weekly for one year "to train her on things she didn't know."  (*Id.*)

[3]      The "Open Channel" forum allowed employees to anonymously make complaints or give feedback. (Def.'s SMF ¶ 67; Oral Arg. 64:24–25.)

you reference.  As such, I would recommend that you contact Paul Slowik, a member of my

staff." (*Id.*)  Ballard-Carter, however, did not immediately contact Slowik or anyone else in

Vanguard's human resources department in regard to her complaint.  (Def.'s SMF ¶ 70; Pl.'s

SMF ¶ 70.)

<strong>D.</strong>

On April 19, 2013 Bakey emailed Catherine Phalen, an AgFa employee who had been

working with Ballard-Carter on the AgFa account.  (Def.'s Mot., Ex. H.)  He wrote that he and

Ballard-Carter "have been working on the list of concerns you gave us the other week and we

hope you have seen a difference.  I'd like to be able to talk to you for about 10 [to] 15 minutes to

get an idea of how things are going recently." (*Id.*)  Phalen responded: "Your timing is quite

good because I have been considering contacting you.  It doesn't seem to me that the

communication between [Ballard-Carter] and me is improving.  Late yesterday I left her a

message indicating that I wanted to speak with her concerning our communication." (*Id.*)

Phalen attached to her email a number of emails between her and Ballard-Carter "which

illustrate[d] . . . the communication difficulties." (*Id.*)

Bakey testified that the emails that Phalen attached demonstrated that Ballard-Carter

"wasn't answering the question, she was answering it incorrectly, and she was writing in a way

that . . . [Phalen] couldn't understand." (Bakey Dep. 30:15–20.)  He stated that after receiving

this email he met with Ballard-Carter "to let her know what the specific feedback was and

showed her some of the examples." (*Id.* 34:16–17.)  He also offered to review Ballard-Carter's

communications with the client for "accuracy, completeness, [and] whether or not she was

answering the [client's] question." (*Id.* 34:18–23.)  Bakey testified that although Ballard-Carter

8

"accepted" his invitation to review her communications during their meeting, he "rarely got anything . . . to review before it went out to the client." (*Id.* 36:14–18.)

**E.**

On September 3, 2013 Ballard-Carter emailed Slowik regarding Bakey. (Def.'s Mot., Ex. O.) She wrote that Bakey told her that she is "not a good communicator," "will not be successful," and that she is "not promotable at all." (*Id.*) She included in her email an excerpt from a message that she previously sent to Bakey where she told him, among other things, that "I was offended when you mentioned my dyslexia." (*Id.*) She also told Bakey that "you stated to me that my communication is not good at all" and "you are now using my dyslexia against me." (*Id.*) Slowik responded to Ballard-Carter on September 10, 2013. (*Id.*) He stated that "I have thought about two options. I would be happy to meet with you if you'd like or I would be happy to see if I can not work to identify an informal mentor for you to use as a sounding board." (*Id.*)

Ballard-Carter responded to Slowik's email on September 18, 2013, stating that she "cannot work in this environment, it's very, very hostile." (*Id.*) As evidence of the purportedly hostile work environment, Ballard-Carter listed 19 "things that [Slowik] need[s] to know," which included complaints that: (1) her one-on-one meetings with Bakey were "always negative and never positive;" (2) Bakey "[n]ever stop [sic] talking in one on ones to allow me to speak;" (3) Bakey "still continues to curse;" and (4) "management sees me as a trouble maker." (*Id.*) In her complaint numbered 17, Ballard-Carter wrote: "I'm partially deaf in one ear and [Bakey] states to me that I have to deal with it, there's not much sympathy that he can give to me. But, if I do not hear what he says he thinks that I'm ignoring him or being sarcastic." (*Id.*) She also listed other health issues she was experiencing, including hair loss and high blood pressure. (*Id.*) Ballard-Carter did not mention any other complaints related to hearing loss or dyslexia.

Slowik responded to Ballard-Carter on September 22, stating that he was aware of some of the "business items" that she mentioned and that "they have previously been investigated and addressed."  (*Id.*)  He wrote that "if these issues persist, I think the best option and appropriate next step is to meet with Dena Bailly to provide just a bit more detail so we can properly look into these issues you raised."  (*Id.*)  Ballard-Carter did not respond to this email or otherwise follow up with Bailly.  (Bakey Dep. 48:21–50:7; Def.'s Mot., Ex. X ("Slowik Dep.") 29:4–7; Def.'s SMF ¶ 75; Pl.'s SMF ¶ 75.)

**F.**

In October 2013 Phalen reiterated to Bakey her "dissatisfaction" with Ballard-Carter's performance on the AgFa account.  (Def.'s Mot., Ex. I.)  At Bakey's request, Phalen summarized her concerns in an October 22, 2013 email.  (*Id.*)  In that email, Phalen stated that Ballard-Carter's: (1) "[r]equests are not consistently handled in a timely manner;" (2) "[a]nswers to requests can go off on a tangent;" (3) "[a]nswers for requests can be incomplete;" and (4) "[a]nswers can be unreliable."  (*Id.*)  Phalen wrote that "[w]hat seems to me a request for information and/or action can turn into [ ] several emails of discussion before the issue is addressed.  It appears that Cassie does not think through her work or pay attention to details."  (*Id.*)  She continued: "Communication is difficult with Cassie.  I feel that I need to 'translate' her emails in order to comprehend her message . . . . For instance, I finally figured out that 'will' often means 'is' and that helps me understand her emails."  (*Id.*)  Phalen included specific instances of her difficulty communicating with Ballard-Carter and sent Bakey previous emails with Ballard-Carter to "support her comments."  (*Id.*)  Shortly after Phalen's October 22, 2013 email, Vanguard removed Ballard-Carter from the AgFa account and placed her on the Chevron

account under CAM Mary Beth Becker.  (Def.'s SMF ¶ 50; Pl.'s SMF ¶ 50; Bakey Dep. 14:8–24.)

## G.

On January 2, 2014 Becker delivered Ballard-Carter's 2013 annual year-end performance evaluation.  (Def.'s SMF ¶ 52; Pl.'s SMF ¶ 52; Def.'s Mot., Ex. J.)  In that review, Ballard-Carter received a rating of "Further Development Needed"—one step below her 2012 performance review rating of "Fully Successful" and one step above the lowest rating of "Did Not Meet Expectations."[4]  (Def.'s Mot., Ex. J; Def.'s Mot., Ex. W ("Becker Dep.") 50:13–51:9.)  Becker gave Ballard-Carter that rating based on Becker's own observations and after consulting with Ballard-Carter's other supervisors, including Bakey.  (Becker Dep. 42:19–46:18.)  Ballard-Carter's performance evaluation summarized three "areas of development" that she was asked to improve upon during her 2013 mid-year evaluation, including "written communication as well as presentation of data back to the client" and "how [she] respond[s] to developmental feedback." (Def.'s Mot., Ex. J.)

Ballard-Carter's "areas for further development" in her 2013 year-end evaluation again included "written communications" and "presentation of data to the client."  (*Id.*)  Her review stated that her "emails to both internal and external clients contain grammatical errors and typos" and that Phalen "requested that we consider removing [her] from the [AgFa] account" due to her communication difficulties.  (*Id.*)  It stated that she "need[s] to take the time to ensure the answer [to a client] is complete and correct before responding" and that she has "not made an improvement in [her] written communications."  (*Id.*)  The review also listed "[i]mproving how [Ballard-Carter] respond[s] to developmental feedback" as an "area for further development."

---

[4]      One step above "Fully Successful" on Vanguard's performance evaluation scale is "Distinguished"—the highest rating an employee can receive.  (Becker Dep. 50:13–19.)

(*Id.*)  It stated that supervisors had previously given Ballard-Carter the same feedback regarding her written communication but that her response had been to "send an email outlining how [she] did not appreciate the feedback, disagreed with the feedback, or disagreed with the method by which the feedback was collected or delivered."  (*Id.*)  It further stated that her "actions and discussions via email clearly indicate that you are not comfortable with the feedback about communication."  (*Id.*)

Ballard-Carter worked for Becker until April 2014 when she went on medical leave for hip pain.  (Def.'s Mot., Ex. L; Ballard-Carter Dep. 83:6–84:19.)  She testified that she suffers from "anxiety and depression" which is also "a key factor" in her disability.  (Ballard-Carter Dep. 84:21–22.)  Ballard-Carter has not returned to work and continues to experience pain in her hip, groin and abdomen.  (*Id.* 85:4–86:16; Def.'s SMF ¶ 63; Pl.'s SMF ¶ 63.)

## H.

At her deposition Ballard-Carter testified that throughout her tenure at Vanguard, Bakey made a number of comments about her hearing loss and dyslexia.  She claims that at some unspecified time, Bakey said something to the effect of: "Oh, that's right, I forgot you were deaf," (Ballard-Carter Dep. 168:22–23); "you're supposed to be talking loudly at your desk," (*Id.* 168:16–17); "we just said that you weren't listening," (*Id.* 124:10–11); "Northerners communicate better than Southerners,"[5] (Def.'s SMF ¶ 79; Pl.'s SMF ¶ 79); and that Bakey once

---

[5]        Ballard-Carter interpreted this to mean that "dyslexia runs in your culture."  (Def.'s SMF ¶ 79.)  Although this testimony is not included in the excerpts of Ballard-Carter's deposition that the parties provided to the Court, the parties do not contest that Ballard-Carter testified to this effect.  (Def.'s SMF ¶ 79; Pl.'s SMF ¶ 79.)

put quotation marks around the word "heard" in an email that referenced her.[6]  (Ballard-Carter 168:11–17.)

She also testified that she requested accommodations for dyslexia and hearing loss at various unspecified times.  She claims that she requested that: (1) she be allowed to review items in writing prior to meetings; (2) she be permitted to listen to large Vanguard meetings from podcasts at her desk rather than attend them in person; (3) her co-workers speak to her face-to-face and not speak over each other at meetings; and (4) Bakey review her emails before she sends them.  (Ballard-Carter Dep. 185:11–93:18; Def.'s SMF ¶ 81; Pl.'s SMF ¶ 81.)  Ballard-Carter did not identify, however, any instance in which any Vanguard employee refused to cooperate with her on any of these requests.  (Def.'s SMF ¶ 82; Pl.'s SMF ¶ 82.)

## II.

Ballard-Carter filed this lawsuit on September 29, 2015.  (ECF No. 1.)  In her complaint, she alleged claims for: disability discrimination under the ADA and PHRA (Counts I and II); failure to accommodate pursuant to the ADA and PHRA (Counts III and IV); retaliation under the ADA and PHRA (Counts V and VI); and hostile work environment under the ADA and PHRA (Counts VII and VIII).  (Compl. ¶¶ 88–133.)  Vanguard filed a motion for summary judgment on May 24, 2016.  (Def.'s Mot., ECF No. 14.)  It argues that the Court should enter judgment in its favor on all counts because she cannot sustain any of her claims.  In response, Ballard-Carter contends that the Court should deny Vanguard's motion because there are disputes of material fact and that a jury could find in her favor on her retaliation, hostile work environment and failure to accommodate claims.  (Pl.'s Opp. to Def.'s Mot. ("Pl.'s Opp.") at 1–2,

---

[6]     Although Ballard-Carter kept contemporaneous notes of "[w]hat [she] thought was significant at that time," the only statement from Bakey that appeared in her notes is "[w]e just said that you weren't listening."  (Ballard-Carter Dep. 31:18–19; 124:7–15.)  She testified that she believed Bakey was "teasing [her] about [her] hearing loss." (*Id.* 124:11–13.)

ECF No. 17.)  She did not respond to Vanguard's argument that the Court should grant summary

judgment in its favor on her claims for disability discrimination under the ADA and PHRA.  (*See*

*generally id.*)  The Court heard oral argument on Vanguard's motion on July 6, 2016.  (Oral Arg.,

ECF No. 21.)

During oral argument, Ballard-Carter's counsel withdrew the retaliation claims (Counts V

and VI).  (*Id.* 3:22–4:23.)  He also stated that he did not oppose Vanguard's motion for summary

judgment on Ballard-Carter's disability discrimination claims (Counts I and II) and withdrew

those claims as well.  (*Id.* 5:3–6:7.)  Ballard-Carter's counsel also stated that "dyslexia is not as a

matter of law her disability" but that her sole alleged disability is her hearing impairment.  (*Id.*

37:15–19.)  The only remaining claims at issue are Ballard-Carter's hostile work environment

and failure to accommodate claims under the ADA and PHRA (Counts III, IV, VII, VIII).[7]  (*Id.*

6:8–15.)

### III.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is genuine if the

evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Summary judgment is granted where

there is insufficient record evidence for a reasonable factfinder to find for the plaintiff.  *Id.* at

252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

---

[7]        "The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively
indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the
same grounds." *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 142 n.5 (3d Cir. 2011) (citation omitted).  The Third
Circuit has stated that "[t]he PHRA is the same as the ADA in relevant respects." *Rinehimer v. Cemcolift, Inc.*, 292
F.3d 375, 382 (3d Cir. 2002) (citation omitted).  Accordingly, the Court's disposition of Ballard-Carter's ADA claim
"applies with equal force to [her] PHRA claim." *Id.*

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."
*Id.*

When ruling on a motion for summary judgment, the Court may only rely on admissible evidence.  *See, e.g.*, *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999).  A Court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## IV.

A hostile work environment claim under the ADA requires "a showing that: (1) [the plaintiff] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action." *See Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999).

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1). Ballard-Carter alleges that she is disabled because she is "partially deaf" which limits a major life activity.[8]  (Pl.'s Compl., ¶ 3.)  At oral argument, counsel stated the "strongest evidence that

---

[8]        "Hearing" is listed as a "major life activity" under 42 U.S.C.A. § 12102(2)(A).

. . . [Ballard-Carter] qualifies as disabled" is an audiogram report diagnosing her with "moderate left hearing loss [and] severe right hearing loss."  (Oral. Arg., 39:5–40:20; Def.'s Mot., Ex. C.) Vanguard contends that Ballard-Carter is not disabled under the ADA because she has failed to present "evidence to indicate a substantial limitation on [her] hearing."  (Def.'s Mot. at 13 (citing *Mengel v. Reading Eagle Co.*, No. 11-cv-6151, 2013 WL 1285477, *3 (E.D. Pa. Mar. 29, 2013) (finding employee with hearing loss "failed to present evidence that her hearing loss in one ear substantially limited her hearing").)  The Court need not determine whether there is a genuine issue of material fact as to her status as "disabled" under the ADA and PHRA; her hostile work environment claims fail because she is unable to show that she was subjected to severe or pervasive harassment.[9]

The Third Circuit Court of Appeals has stated that "[t]he discriminatory conduct must be so extreme as to amount to a change in the terms and conditions of employment."  *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609 (3d Cir. 2007) (citing *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005)).  Offhand comments and isolated incidents "are insufficient to sustain a hostile work environment claim" unless they are "extremely severe."  *Id.*  The environment must have been objectively hostile or abusive and the plaintiff must have subjectively perceived it as such.  *See Walton*, 168 F.3d at 667.

The Third Circuit has stated that "[t]he statute prohibits severe or pervasive harassment; it does not mandate a happy workplace.  Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the

---

[9]     Similarly, since the Court finds that the comments were not sufficiently severe or pervasive it is unnecessary to analyze whether Ballard-Carter could satisfy the other elements of a hostile work environment claim.

plaintiff's employment."[10] *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006), *overruled on other grounds by Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831 (3d Cir. 2016).  Whether harassment is "severe or pervasive" is determined by: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Jensen*, 435 F.3d at 451 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (internal quotation marks omitted)).  "No one factor is dispositive, and the analysis must focus on the totality of the circumstances."  *Id.* at 451–52 (internal citation and quotation marks omitted).

In her opposition to Vanguard's motion, Ballard-Carter alleges she was "subjected to a constant barrage of discriminatory abuse in the form of her supervisor's comments."  (Pl.'s Opp. at 7.)  The record, however, does not show that Ballard-Carter was subjected to comments that were sufficiently "severe or pervasive" to satisfy this element of a hostile work environment claim.  To the contrary, the only evidence of any potentially offensive comments were sporadic remarks that Bakey made on unspecified occasions.  Specifically, Ballard-Carter claimed at her deposition that Bakey told her: "Oh, that's right, I forgot you were deaf," (Ballard-Carter Dep. 168:22–23); "you're supposed to be talking loudly at your desk," (*Id.* 168:16–17); "we just said that you weren't listening," (*Id.* 124:10–11); "Northerners communicate better than Southerners,"  (Def.'s SMF ¶ 79; Pl.'s SMF ¶ 79); and that Bakey once put quotation marks around the word "heard" in an email that referenced her.   (Ballard-Carter Dep. 168:11–17.)

On their face, a number of Bakey's allegedly harassing comments were not attacks on Ballard-Carter's hearing impairment.  Even if they were, all of the comments taken together were

---

[10]        The Third Circuit in *Jensen* addressed a hostile work environment in the context of Title VII.  The court has recognized that "the ADA [ ] and Title VII [ ] serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well."  *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 157 (3d Cir. 1995).

not severe or pervasive enough to sustain a hostile work environment claim.  In the Third Circuit,

the plaintiff must have been subjected to significantly more in order to satisfy the "high"

threshold of the "severe or pervasive" element.  *Greer v. Mondelez Global Inc.*, 590 F. App'x

170, 173 (3d Cir. 2014); *see Lescoe v. Pa. Dept. of Corrections-SCI Frackville*, 464 F. App'x 50,

54 (3d Cir. 2012) (holding that frequent "jokes and comments about [plaintiff's] weight, the size

of his belly, and not being able to see his groin area" did not "reach a level of sufficient severity

or pervasiveness to alter the conditions of Lescoe's employment"); *Walton*, 168 F.3d at 667

("Although it is clear that the relationship between [plaintiff] and [her supervisor] was poor,

[she] has not asserted facts that would allow a reasonable jury to find that [her supervisor]

harassed her because of her disability."); *Stough v. Conductive Techs., Inc.*, No. 12-cv-2545,

2014 WL 3421069, at *5 (M.D. Pa. July 11, 2014), *aff'd*, 613 F. App'x 145 (3d Cir. 2015)

(granting summary judgment and finding alleged conduct not sufficiently "severe or pervasive"

where plaintiff with Parkinson's disease alleged that his employer sent him a booklet on

Parkinson's disease and a supervisor told him that "his new position was 'not so bad' considering

that he had Parkinson's disease"); *McCutchen v. Sunoco, Inc.*, No. 01-cv-2788, 2002 WL

1896586, at *12–13 (E.D. Pa. Aug. 16, 2002), *aff'd*, 80 F. App'x 287 (3d Cir. 2003) (granting

summary judgment in favor of employer on hostile work environment claim where employee

with partial blindness alleged coworkers called him "useless" and made comments including "for

a guy that can't see you know how to look in a book," and plaintiff "didn't have to see, he merely

needed to feel around").

      Contrary to her claim in her opposition brief that she was subjected to a "constant

barrage" of offensive comments, Ballard-Carter's counsel stated at oral argument that her claims

were premised on Bakey's comments being "more severe than . . . pervasive."  (Oral Arg. 50:21–

22.)  That argument also fails.  Although the Third Circuit has stated that "isolated conduct, which is severe enough can give rise to a hostile work environment," *Tourtellotte*, 636 F. App'x at 847, the statement at issue must be "extremely serious."  *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005).  In support of her claim that Bakey's comments were sufficiently "severe," Ballard-Carter relies on a case from the Fourth Circuit where the court denied summary judgment where a supervisor called the African-American plaintiff a "porch monkey" two times on consecutive days.[11]  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 270 (4th Cir. 2015).  The court stated that these comments—"whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment."  *Id.* at 280.  Also relevant to the court's analysis of the severity of the comments were the supervisor's threats that he would have plaintiff fired.  *See id.*  Although Ballard-Carter may have perceived Bakey's comments as offensive, they are in no way comparable to the severity of the statements at issue in *Boyer-Liberto*.  Further, her claim that she was offended by the comments does not make them "severe or pervasive."  The comments must have been objectively hostile or abusive.  *See Walton*, 168 F.3d at 667.  The undisputed material facts accordingly demonstrate that she cannot sustain a hostile work environment claim.

## V.

Ballard-Carter's counsel conceded at oral argument that "the hostile work environment claim is stronger [ ] than the failure to accommodate claim," but "[t]hat doesn't mean [she's] conceding the failure to accommodate claim."  (Oral Arg. 62:13–18.)  In order to sustain a prima facie claim of discrimination for failure to accommodate, Ballard-Carter must demonstrate that

---

[11]     Ballard-Carter also cites *Bedford v. Se. Pa. Transp. Auth.*, 867 F. Supp. 288, 297 (E.D. Pa. 1994) for the proposition that "a single act of harassment . . . may be sufficient to sustain a hostile work environment claim." (Pl.'s Opp. at 8-9.)  *Bedford*, however, does not support her position.  In that case our Court dismissed plaintiff's hostile work environment claim based on an "isolated" incident because she could not "reasonably have perceived the [alleged conduct] as constituting a sexually hostile working environment."  *Id.* at 297.

"(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

Ballard-Carter cannot sustain her claim for failure to accommodate because the undisputed facts demonstrate that she has not suffered an "adverse employment decision as a result of discrimination."[12] *Id.* In the context of failure to accommodate claims, "[a]dverse employment decisions . . . include refusing to make reasonable accommodations for a plaintiff's disabilities." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). The Third Circuit has defined a "reasonable accommodation" to include "the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith [ ] under what has been termed a duty to engage in the 'interactive process.'" *Id.* (internal citation omitted). To demonstrate that an employer failed to participate in the interactive process, a disabled employee must show: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir. 1999) (citations omitted).

The Third Circuit has stated that when analyzing the interactive process, "courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary." *Id.* at 312 (citations and internal quotation marks omitted). Further, "both parties bear responsibility for determining

---

[12]     Since the undisputed facts demonstrate that Ballard-Carter did not suffer from an adverse employment decision as a result of discrimination, the Court need not address whether she was disabled within the meaning of the ADA or whether she is otherwise qualified to perform the essential functions of the job.

what accommodation is necessary . . . [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Id.* (internal quotation marks omitted).

In *Parker v. Verizon Pennsylvania, Inc.*, 309 F. App'x 551, 552–53 (3d Cir. 2009), an employee alleging he had a medical condition affecting his ability to breathe and talk brought a failure to accommodate claim after Verizon terminated him from his position as a customer sales and service consultant in a call center. The Third Circuit affirmed the lower court's decision to grant summary judgment in favor of Verizon. *Id.* at 564. The court found that Verizon had satisfied its duty to engage in the interactive process in good faith because they "interacted with [the employee] and asked if he could suggest any reasonable accommodations," there was "evidence of the accommodations afforded to [the employee]" and the employee "testified in his deposition that he could not 'think of any' instance where Verizon personnel refused to discuss any reasonable accommodations with him." *Id.* at 554, 560–62.

Similarly here, Ballard-Carter did not identify any instance in which any Vanguard employee refused to cooperate with her on any of her requests. (Def.'s SMF ¶ 82; Pl.'s SMF ¶ 82.) Her attorney conceded at oral argument that "Vanguard is correct . . . that the record doesn't reflect any refusal to cooperate with her on these requests." (Oral Arg. 61:3–6.) Nonetheless, in support of her claim Ballard-Carter cites to her September 18, 2013 email to Slowik in which she lists 19 specific complaints, one of them related to her alleged hearing impairment: "I'm partially deaf in one ear and [Bakey] states to me that I have to deal with it, there's not much sympathy that he can give to me. But, if I do not hear what he says he thinks that I'm ignoring him or being sarcastic." (Def.'s Mot., Ex. O; Oral Arg. 63:11-65:24.) Even if construed as a request for an accommodation, however, Vanguard made a good faith effort to

21

assist her in seeking one.  Slowik responded to that email, stating that he was aware of the issues she mentioned and that they had been previously investigated.  (Def.'s Mot., Ex. O.)  He stated that if the issues persist, Ballard-Carter should contact Bailly to provide more details and to allow Vanguard to investigate further.  Ballard-Carter, however, did not respond to this email or follow up with Bailly.  (Bakey Dep. 48:21–50:7; Slowik Dep. 29:4–7; Def.'s SMF ¶ 75; Pl.'s SMF ¶ 75.)

Further, the record is replete with examples of Vanguard employees actively seeking to help Ballard-Carter improve her written communication skills and to improve her relationship with her supervisors: Bakey offered to review her emails before she sent them to the client, which Ballard-Carter declined; a Vanguard employee responded to her Open Channel submission and asked her to contact Slowik or another member of the human resources department so that they could assist her; Bakey frequently met with her in one-on-one sessions to train her on Vanguard software or help her improve her communication skills; and Bailly responded to her complaints about Bakey by speaking with him and assuring her that they were "committed to . . . helping [her] develop professionally."[13]  Since the undisputed facts demonstrate that Vanguard consistently made good faith efforts to assist Ballard-Carter improve her communication skills, she cannot sustain a prima facie case for failure to accommodate.

An appropriate Order follows.

---

[13]     Ballard-Carter also alleges in her response to Vanguard's motion that she requested transfer "to another position where [Bakey] was not her supervisor."  (Pl.'s Opp. at 18.)  Ballard-Carter, however, cannot sustain a claim for failure to accommodate premised on Vanguard's refusal to transfer her to a new supervisor.  *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998) ("[N]othing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy") (citation and internal quotation marks omitted).

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.